(118 So. 242)

## CUNNINGHAM v. STATE. (7 Div. 422.)

Court of Appeals of Alabama. May 8, 1928.

Rehearing Denied Aug. 7, 1928.

586

E. O. McCord & Son, of Gadsden, for appellant.

Charlie C. McCall, Atty. Gen., and Knox, Acker, Sterne & Liles, of Anniston, for the State.

SAMFORD, J. ▮ The defendant lives in Gadsden and the party assaulted in Calhoun county, about 25 miles from Gadsden. The party assaulted (Mrs. Pauline Scott) who was at the time of the assault about 22 years of age, had as an orphan girl lived with defendant's mother, but some years before the assault she had left this home for another, and, finally, had married one Scott, with whom she was then living in a small two-room house about 50 feet from the public road. Defendant had known the girl when she lived with his mother, but he had lost sight of her and did not know where she lived or whom she had married. On Sunday before the assault on Tuesday night, at which same time Pauline's husband, Lum Scott, was murdered, this defendant was in the neighborhood of the Scotts at the house of a kinsman named "Patterson," at which time he inquired about Pauline and where she then lived, giving as a reason that there were some packages at his mother's belonging to Pauline and he wanted to send them to her. When defendant left the Pattersons, he and another with him, traveling in a motorcar, went in the direction of where Pauline lived and from several parties inquired as to where she lived. Finally, he came to the house and finding Pauline and her husband gone he went on by the house and did not stop. In making inquiries from various parties as to where Pauline lived he gave various reasons for wanting to know. One was that he wanted to buy a cow from Lum (the husband); another that he had with him Pauline's brother-in-law, who wished to see her. All of this was admissible as circumstances tending to prove a continued interest in Pauline, although there had been a lapse of several years since he had seen her and there was no real bond between them. Such facts were also admissible as tending to prove a knowledge on the part of defendant with conditions surrounding the party assaulted. These facts segregated and taken alone would not tend to connect the defendant with the commission of the crime charged, but when taken and considered with other facts may be circumstances from which guilt may be inferred. In cases like the one under consideration, where the evidence is largely circumstantial, the inquiry naturally takes a wide range, and many facts, innocent in themselves, may yet have a bearing on the issues involved. Lancaster v. State, 21 Ala. App. 140, 106 So. 609.

▮ Under the facts in this case the sole question of merit is one of identity of the defendant. There is no doubt of the corpus delicti and the evidence discloses without conflict a state of facts which if true makes out a case of a brutal and unlawful assault to murder. The defendant denies being present. He is positively identified by the assaulted party. Any fact tending to disclose an opportunity for the party (Pauline) to have seen and observed him on the night of the assault would be relevant and admissible. What the defendant said and did when he first came to the house of Pauline the night of the assault; that he called her husband to assist him in getting his car out of the ditch; that the defendant and her husband went out of the house together; that defendant soon returned without the husband and handed her a note; that defendant told her the note was sent by her husband; that she told him her husband could not read and write and then defendant said the note was written by Mr. Gresham; that the next morning the husband was found dead a short distance from the house from the result of a blow on the head with a hammer; that the defendant had a hammer in his pocket; that there was a light in the house; in fact, everything said and done therein and about the house that night which in any way tended to impress the identity of the defendant on the witness was relevant. Even if some questions were allowed and answers admitted which might be said to be immaterial, such could not injuriously affect defendant's rights and would not justify a reversal. We have carefully read and re-read the testimony of Pauline, the assaulted party, together with the numerous objections and exceptions. In all of the court's rulings the inquiry was confined to the rule as above stated and in none of them do we find reversible error. The defendant offered in evidence note, unsigned and addressed to Mrs. Pauline Scott, some fragments of a letter claimed to have been found in a tin box in the house of Pauline Scott, also a tin can and a square piece of envelope upon which was stamped "Spring Garden." There was some evidence offered and excluded tending to prove that Pauline Scott had received such letters, but there was no evidence connecting the foregoing articles with the crime here charged. They were properly excluded.

 It was relevant to prove that on the night of the assault and just prior thereto the defendant had a hammer and for purposes of description it was permissible to exhibit a hammer to the witness then testifying and ask her if the hammers were similar. As to whether the hammer exhibited was ever so identified as to be admissible in evidence as the hammer used in the assault presents a very different question. If it was so identified and found in the shop of defendant, it would have been admissible as a circumstance against the defendant, and, if not so identified, it would not be so admissible. The court, by its rulings, observed this distinction and in so doing did not err. The witness Pauline Scott was permitted, over objection and exception, to state that before the assault she had heard, through a letter written her by Mark Cunningham's wife, that Mark was dead. The fact of Mark's death was not in issue. The fact that witness had been so informed was a collateral *fact*, to which witness could testify as bearing upon the uncertainty of her testimony relating to identity of defendant during the conversation between them just prior to the assault. In that conversation she testified that she said to defendant: "You look like a man I used to know." Defendant asked who, and she replied: "Mark Cunningham." He replied: "You are mistaken; my name is Mangum and my home is in Cleburne county." In connection with this and collateral to the issues, the witness might state as a fact, bearing on the uncertainty of recognition, that she had been informed that Mark Cunningham was dead.

 Jennie Elder, in describing the car in which defendant was riding on Sunday before the assault, said: "It had a motor meter on it." In explanation of her testimony it was permissible for her to explain what she understood a "motor meter" to be.

On the redirect examination of state's witness Usrey, he volunteered the statement: "I asked (Mrs. Scott) do you know Mark Cunningham?" and she said, "Yes; I know Mark Cunningham, but he is dead; I had a letter from his wife." State's counsel moved to exclude this, the court overruled the motion of *defendant*. What motion of defendant was overruled does not appear. The ruling of the court seems to be confused, or at least that is the way it appears in the record.

 Dr. Culberson qualified as an expert. It was proper to allow him to describe the wounds upon Pauline Scott and then to give his opinion as to whether such wounds were made with an instrument likely to produce death.

 The doctor was asked the question: "Whether in your opinion there had been some fracture of the skull." He answered: "No; not a fracture, but all other injuries." What the doctor meant by "all other injuries" is not quite clear, but a part of the answer was proper and no separate motion was made to exclude that which was not understandable.

 During the trial of a cause the court can at any time, upon proper motion, exclude illegal testimony. So that when it appeared that the testimony of defendant's witness Keel was hearsay, it was proper for the court to grant the motion of the state to exclude.

 The statement of defendant's witness Dr. Lane, "I never heard the man's name (meaning defendant's) until I was called on the stand," was voluntary, not in answer to any question, and was illegal and immaterial.

 The insistence is made that the court committed error in refusing to permit the defendant to introduce certain notes or letters tending to disclose an illicit relation between Pauline Scott and some other unknown party. In the first place none of these papers were identified as being connected with the crime charged, and in the next place, even if it had been shown that Mrs. Scott had received these notes, her relationship with another person not in any way connected with the crime could not be received as evidence that the defendant is not guilty. Conceding that everything the defendant offered to prove was true and that there were illicit relations between Mrs. Scott and some unknown person, these facts, in the absence of any evidence tending to connect this other person with the crime, would in no way tend to disprove the fact that defendant committed the crime. It is true, as stated by appellant's counsel, if these letters or notes had been admitted in evidence, an argument to the jury might have been adroitly made which would have confused the issues and might have led the jury into grave error in arriving at a correct conclusion regarding the true issues. For that very reason the court correctly ruled it all out.

 Whether this defendant had been acquitted of the charge of murdering Lum Scott on the same night that he is charged with this assault is beyond the issues of this trial. It can well be seen that, even if guilty of the murder of Lum Scott, defendant might have been acquitted for lack of proof, or, if innocent of that murder, he still might be guilty of the crime here charged. In other words, the murder of Lum and the assault on Pauline are two separate and distinct crimes.

 It was shown by the evidence that the crime was committed with a hammer of a certain description. As a circumstance it was relevant to prove that defendant had hammers in his shop of the same description. It was shown that the man who committed the crime had and exhibited to Pauline a pair of silk hose. It was, therefore, a circumstance worthy of proof that when his room was searched shortly after the crime a pair

of silk hose of similar character was found. It was testified to that on the night of the assault defendant was wearing a red sweater; therefore it was also a circumstance to be considered that when defendant's shop was searched a similar red sweater was found. These circumstances were subject to explanation, but were admissible to be considered by the jury in connection with all the other evidence in the case and it was for them to say whether they were the same. The law of evidence is adjusted to the law of mind as well as to the general law of the land and in proving a case by circumstantial evidence any fact is relevant which, when taken alone or in connection with other proven facts, would warrant a jury in drawing a logical inference with reference to the issue being tried. Stone v. State, 118 Ga. 705, 45 S..E. 630, 98 Am. St. Rep. 145. It is sometimes difficult to mark with precision the line which separates the limits of just and reasonable inference from those of mere conjecture or surmise. This arises necessarily from the nature of indirect evidence. Being founded on the observation and experience of the mutual connection between facts and circumstances, the question of its competency is easy or difficult of solution according as such supposed connection is constant or more or less regular and frequent. The foregoing is a paraphrase of the text in 8 R. C. L. p. 180, which then lays down as a safe rule that:

"In no case is evidence to be excluded of any fact or circumstance connected with the principal transaction from which an inference as to the truth of a disputed fact can reasonably be made." Commonwealth v. Jeffries, 7 Allen (Mass.) 548, 83 Am. Dec. 712.

■■ The evidence of the Mitchells to the effect that the defendant was in a Ford touring car in front of their house at 11 o'clock on the night of the crime, and that the place where defendant was at that time was on a road leading from where the crime was committed to Gadsden, where defendant lived, was competent as a circumstance tending to connect defendant with the crime, and also tended to impeach defendant and his wife as to his alibi.

■■ It is insisted that all of the evidence tending to prove that defendant was in the neighborhood of Lum Scott and his wife, Pauline, on Sunday before this crime was committed on Tuesday night, is irrelevant, and should have been excluded, and it is suggested and argued that many other people were in that neighborhood on that day. If there were they were not strangers to the community, with a former acquaintance with Pauline Scott, a young woman married to an elderly illiterate man. No others had been associated with Pauline when she was an orphan girl in a home where she was a dependent. None of these others made particular inquiries as to where Pauline lived and then followed it up by going out of the way to locate and see the house where she lived. The circumstances testified to by the witnesses, as to defendant's visit and inquiries on Sunday all point to some purpose in defendant's mind towards Pauline, and, when coupled with the facts relating to defendant's movements on Tuesday night, became, if true, strong circumstances tending to prove a motive and the commission of the crime. Of course, it is not necessary for the state to prove a motive on the part of defendant; but, even so, it requires only a knowledge of men and human nature and a little logic to reason from cause to effect in order to arrive at the purpose and design of the man who committed this crime. So much has been said by way of reply to the suggestion by counsel that the court has fixed an extreme sentence. If defendant is innocent, any sentence would be too severe, and, if guilty, the term fixed is all too short.

■■ It is insisted by appellant that the oral charge of the court is "so cut up" as to mislead and confuse the jury in its deliberations. With this we do not agree. We have carefully read the court's oral charge. It presents the law to the jury in clear, concise form and simple enough for any juror to understand its true meaning. If any confusion arose with reference to the charge, such confusion grew out of the many exceptions reserved to the charge by appellant's counsel and the apparent desire of the court to meet appellant's objections. Regarding these exceptions, only one has any merit, when the excerpts are considered along with the entire charge. The exception of merit was a reference to the crime as being an "awful crime." This was error, but the court promptly corrected it, withdrew it from the jury in a very emphatic manner, and we think cured the error.

We find no prejudicial error in the record, and the judgment is affirmed.

Affirmed.

### On Rehearing.

■ At the earnest insistence of defendant's counsel we have again considered the questions involving the court's rulings respecting two papers, termed "notes," offered in evidence by defendant. The first of these is as follows:

"Mrs. Payilone Scott—Lum is gone to Annis-ton and he said for me to stay with you tell he come back he is gone to town with old man Grashem Paylone I never would a found whear you lived if I haden stoped in Alexandria I sure have drove a long ways way from Cleburn country just to see you and you have got to do what you promest."

It is clear that, if this note had been identified as the note handed to Mrs. Pauline Scott on the night of the crime by the party who assaulted her, it would have been very material and a part of the res gestæ. Before,

however, it can be relevant, it must be so connected and identified. Mrs. Scott denied that she had ever seen it. The defendant's witness Pearce testified that shortly after the crime he went to the Scott house; that Pauline told him about a note that was given her by the assaulter; that he examined the house and went down the road looking for the note; that he found nothing. Some time after that, and after defendant had had one trial, how long after the witness did not know and the record does not disclose, this witness Pearce went back down to the Scott house. The house was vacant, and Jim Scott, the dead man's brother, to whose house Pauline went after the assault, had moved away. At that time witness claims to have found the paper offered in evidence:

"Between the house she lived in and between the house that Mr. Jim Scott lived in, at a little sewer pipe, where it runs down by a little drain ditch."

These facts do not identify the paper as being the note handed Mrs. Scott; nor is there sufficient similarity in the wording of the note offered and that to which Mrs. Scott testified to warrant its admission in evidence. Ex parte Edmunds, 203 Ala. 349, 83 So. 93.

The second note claimed to have been found in a tin snuff box in the ashes in the fireplace of the Scott house, long after the crime, is dependent on the first note. We see no reason to change our ruling on these two questions.

The application is overruled.